UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KEVIN A. MYERS, JR., | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CASE NO. 3:18-cv-505 (KAD) |
| | : | |
| SCOTT SEMPLE, et al., | : | |
|     Defendants. | : | |

**MEMORANDUM OF DECISION**

**Preliminary Statement**

The plaintiff, Kevin A. Myers, Jr. ("Myers"), commenced this civil rights action asserting claims for violation of his constitutional rights in connection with his Security Risk Group ("SRG") hearing and classification. Following the Court's, Hall, D.J., initial review, two claims remain, a Procedural Due Process Clause claim and a false accusation claim. Initial Review Order, Doc. No. 9, at 18. The remaining defendants, District Administrator Angel Quiros, Lieutenant Lizon, Lieutenant Richardson, Officer S. Ocasio, and Warden Maldonado ("the Defendants"), filed a motion for summary judgment asserting that Defendants Quiros and Maldonado were not personally involved in the incidents underlying the complaint; Myers did not fully exhaust his administrative remedies; Myers' due process rights were not violated, and the Defendants are protected by qualified immunity. Myers' response was due by June 13, 2019. To date, he has neither filed opposition papers nor sought an extension of time within which to do so.[1] For the reasons that follow, the Defendants' motion is **granted**.

---

[1] After the response date passed, the Defendants filed a motion seeking default summary judgment based on Myers' failure to timely file his opposition. This motion is denied as moot.

**Standard of Review**

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P.; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113-14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Which facts are material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense …." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated speculation' but 'must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (quotation marks and citation omitted). To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

Although the court is required to read a self-represented "party's papers liberally and

interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

**Facts[2]**

On May 11, 2016, Officer Ocasio was conducting a correspondence review at Osborn Correctional Institution ("Osborn"). Doc. No. 34-22, ¶ 1. He saw a letter written by Myers addressed to Roberto Delgado. The U.S. Post Office had returned the letter to the facility because it had a non-deliverable address. *Id.*, ¶¶ 1-2.

The letter, dated April 16, 2016, was handwritten. *Id.*, ¶ 4. The salutation was "Dear Iceman." Correctional officials know a person nicknamed "Iceman" as Robert Delgado, a former inmate and high-ranking member of the Security Risk Group ("SRG") Los Solidos. Delgado had recently discharged from custody. *Id.*, ¶ 4. A search of the Department of Correction database confirmed that inmate Delgado, a/k/a Iceman, had an affiliation with Los Solidos which was removed in 1999. *Id.*, ¶ 5.

---

[2] The facts are taken from the Defendants' Local Rule 56(a)1 Statement and supporting exhibits and the exhibits attached to the Complaint. Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each admission or denial must include a citation to an affidavit or other admissible evidence. In addition, the opposing party must submit a list of disputed factual issues. D. Conn. L. Civ. R. 56(a)2 and 56(a)3. Although the Defendants informed Myers of this requirement, Doc. No. 34-23, he has not submitted the required Local Rule 56(a)2 Statement or responded to the motion for summary judgment. Accordingly, the Defendants' facts are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)1 ("Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact.").

Officer Ocasio read the letter and perceived admissions by Myers of gang involvement at Osborn. Officer Ocasio contacted Lieutenant Lizon, his supervisor. Lieutenant Lizon read the letter and confirmed Officer Ocasio's determination that the letter contained admissions of gang involvement. *Id.*, ¶ 6.

In the letter, Myers described his location at Osborn and the inmates with whom he associated. Myers stated that he had followed Delgado's advice and located two inmates, "Figgy" and "Big Figgy," at Osborn. The Department of Correction database showed that both inmates were former Los Solidos members whose affiliations were removed in 2000 and 1999, respectively. *Id.*, ¶ 7.

Renouncing SRG membership and having the SRG affiliation removed while in custody shows that an inmate has completed the Department of Correction gang renunciation program. When an inmate completes this program, he can be transferred to a housing unit with less restrictive conditions. *Id.*, ¶ 8. Lieutenant Lizon is aware that many inmates who renounce SRG membership continue to be active in the gang but do so in a more secretive manner to prevent detection of their activity by correctional staff. *Id.*, ¶ 9.

Myers wrote that he was handling his responsibilities and he "actually had the ticket block. Seems as though Mafia and you taught me right. You guys made me a leader." *Id.*, ¶ 10 (quotation marks omitted). Officer Ocasio and Lieutenant Lizon understood this language as an admission that Myers has a leadership position as Block Lieutenant for the Los Solidos in his housing unit. *Id.*, ¶ 11.

In another part of the letter, Myers described the months he spent with Iceman as "nothing short of pure honor" and he thanked Delgado for his guidance and wisdom. *Id.*, ¶ 12

(quotation marks omitted). Officer Ocasio and Lieutenant Lizon understood this language as Myers thanking Delgado for bringing him into Los Solidos as a member and his feelings about membership in the group. *Id.*

Myers also asked Delgado to "write a letter to me [Myers] so that I can show to other brothers who try to take my flames that I have your blessing and that if they have anything to say, that it's dead. I mean you are the GF and anything you say goes." *Id.*, ¶ 13 (quotation marks omitted). Officer Ocasio and Lieutenant Lizon interpreted this language as referring to Myers' conviction for sexual assault. A person convicted of such a charge generally is not accepted into an SRG and may be terminated from the group. *Id.*, ¶ 14. However, if Myers had Delgado's blessing, other SRG members would respect Delgado's position and not try to terminate Myers' membership. *Id.*, ¶ 17. The reference to GF is short for God Father, the highest rank in the Los Solidos. Delgado a/k/a Iceman is considered one of the founding fathers of SRG Los Solidos. *Id.*, ¶ 15. The reference to brothers is to other Los Solidos members and "try to take my flames" means taking his gang colors or terminating his gang membership. *Id.*, ¶ 16 (quotation marks omitted).

After reviewing the letter, Lieutenant Lizon contacted the Security Intelligence Division for approval to proceed with Myers' classification as an SRG member. *Id.*, ¶ 18. The Security Intelligence Division had reservations about Myers' membership in the SRG because of his sexual assault conviction and requested additional confirmation of Myers' gang involvement. *Id.*, ¶ 19.

Lieutenant Lizon interviewed a reliable informant who was a respected former Los Solidos member. *Id.*, ¶ 20. The informant stated that Myers was "good money and he was

5

brought home by Iceman." This statement indicated to Lieutenant Lizon that Myers was a member of the SRG Los Solidos. *Id.*, ¶ 21 (quotation marks omitted). The information was relayed to the Security Intelligence Division which approved issuance of a disciplinary report and Myers' change in classification. *Id.*, ¶ 22. The Security Intelligence Division issued a Notice of Decision and a Class A disciplinary report to Myers and sent a hearing notice to Lieutenant Lizon recommending that Myers be placed in Phase I of the SRG Program. *Id.*, ¶ 23. The hearing notice, stating that a Security Risk Group Member hearing would be scheduled on a date to be determined, was signed by Lieutenant Richardson. Defs.' Mem. Ex. 10, Doc. No. 34-10. The Security Risk Group Member Notification of Decision, delivered and witnessed by Lieutenant Richardson, indicates that the hearing was held on May 25, 2016. *Id.,* Ex. 8, Doc. No. 34-8.

The medical unit cleared Myers for placement in the restrictive housing unit ("RHU"). Officer Bailey escorted Myers to RHU at Lieutenant Lizon's direction. Doc. No. 34-22, ¶ 25.

On May 12, 2016, within 24 hours of RHU placement, Officer Tugie delivered to Myers a disciplinary report for SRG affiliation. The report was signed by Lieutenant Lizon. *Id.*, ¶ 26. The disciplinary report was based on the wording of the letter describing "behaviors uniquely or clearly associated with a security risk group." *Id.*, ¶ 27. The following day, Lieutenant Lizon issued a Restrictive Housing Order for Myers based on SRG Los Solidos affiliation. *Id.*, ¶ 28.

Myers' disciplinary hearing, scheduled for May 17, 2016, was adjourned for further investigation. The hearing was held on May 25, 2016. *Id.*, ¶ 29. Myers pled not guilty. He did not request assistance of an advocate. *Id.*, ¶ 30. Myers presented his own statement and statements from two inmates stating they knew nothing about any gang affiliation. *Id.*, ¶ 31.

6

Following the hearing, Hearing Officer Richardson found Myers guilty based on the evidence contained in the incident reports, the confidential and credible informant, and departmental records. *Id.*, ¶ 32.

Following the hearing. Myers' classification was changed to SRG member. *Id.*, ¶ 33. Under Department of Correction Administrative Directives, Myers had fifteen days from the date of the decision to file an appeal. *Id.*, ¶ 34. Myers was informed of this requirement through a statement in the SRG Member Notification of Decision which was provided to Myers on May 25, 2016. *Id.*, ¶ 35. Myers' appeal was received and date-stamped by the Osborn Administrative Remedies Coordinator on June 15, 2016, six days beyond the deadline. *Id.*, ¶ 36. It was rejected as untimely. *Id.*, ¶ 37.

**Discussion**

The Defendants move for summary judgment on the grounds that they did not violated any of Myers' constitutional or due process rights and, if they did, they are protected by qualified immunity. In addition, the Defendants argue that Myers did not sufficiently allege the personal involvement of Defendants Quiros and Maldonado and he failed to exhaust his administrative remedies before commencing this action.

**Personal Involvement**

The Defendants argue that Myers fails to demonstrate the personal involvement of Warden Maldonado or District Administrator Quiros in the purported constitutional deprivations. "It is well settled … that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks omitted); *see also Johnson v. Glick*, 481 F.2d

1028, 1034 (2d Cir. 1973) (doctrine of respondeat superior does not suffice for claim of monetary damages under § 1983). Warden Maldonado and District Administrator Quiros are supervisory officials. To establish the personal involvement of supervisory officials, Myers must show that the Defendants were aware of, and failed to correct or stop, a constitutional violation. *See Shaw v. Prindle*, 661 F. App'x 16, 18 (2d Cir. 2016) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

The Defendants argue Warden Maldonado is named as a defendant only because he was the warden at the time of the incidents underlying this action. Indeed, in the Complaint Myers names Warden Maldonado "under municipality" and thereafter describes no action or inaction on his part. Myers summarily asserts that "[Maldonado] know (sic) what his subordinates were doing and was updated on the proceedings." *Id.*[3] In addition, Warden Maldonado's name does not appear in any documents in the record relating to Myers' claims. And although Myers' Complaint is verified and can be considered as an affidavit in opposition to the motion for summary judgment, Myers is not competent to testify as to what Warden Maldonado knew. Thus, the allegation in the Complaint is insufficient to create an issue of fact regarding Warden Maldonado's involvement in the alleged constitutional deprivations. *See Curtis v. Cenlar FSB*, 654 F. App'x 17, 20 (2d Cir. 2016) (although court may treat "verified complaint 'as an affidavit for summary judgment purposes,' the allegations contained therein can suffice to defeat summary judgment only insofar as they were made on personal knowledge") (quoting *Colon v.*

---

[3] The Court, Hall, D.J., permitted a supervisory liability claim to proceed against Warden Maldonado under the holding in *Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013). *See* Doc. No. 9 at 16-17. In *Grullon*, the Second Circuit held that a letter "to the Warden at an appropriate address and by appropriate means" was sufficient to state a plausible claim that the Warden was aware of the incident and warrant discovery regarding his knowledge and response. 720 F.3d at 141. The court noted, however, that proof of knowledge and lack of action in response would be required to survive summary judgment. *Id.* at 140-41.

*Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)). As noted, Myers has not submitted any opposition to the motion for summary judgment. Accordingly, the motion for summary judgment as to Defendant Maldonado is granted. *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) (personal involvement requires more that mere linkage in the chain of command) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)).

The Defendants next argue that Myers fails to allege facts supporting the personal involvement of District Administrator Quiros. Myers alleges that District Administrator Quiros overlooked his disciplinary appeal after telling Myers to refile the appeal. Doc. No. 1 at 11. This allegation is demonstrably incorrect. Per the Rule 56(a)(1) statement, deemed admitted, as well as the documents attached to the Complaint, District Administrator Quiros reviewed Myers' appeal and re-filed appeal and rejected both on procedural grounds. *See id.*, Ex. F (rejecting initial appeal as exceeding allowed single additional page) & Ex. I (rejecting re-filed appeal as untimely). Thus, District Administrator Quiros did not "overlook" or ignore Myers' appeal.

As the Complaint might simply be unartfully drafted, the Court considers whether Myers' claim is perhaps that District Administrator Quiros did not timely retrieve the re-filed disciplinary appeal from the Administrative Remedies box or ensure that it was retrieved on the date it allegedly was deposited. But there is no evidence or verified allegations that District Administrator Quiros was responsible for retrieving appeals or was aware that appeals may not have been retrieved in a timely manner. Accordingly, Quiros has established that he was not personally involved in the purported constitutional deprivation and summary judgment is granted as to Defendant Quiros.[4]

---

[4] The Court further notes that although due process requires certain protections at the hearing, there is no constitutional requirement for an appeal of the hearing decision. *See Wolff v. McDonnell*, 418 U.S. 539, 563-71

**Exhaustion of Administrative Remedies**

The Defendants next argue that Myers failed to exhaust his administrative remedies before filing suit. The Prison Litigation Reform Act requires prisoners to exhaust administrative remedies before filing a federal lawsuit relating to prison conditions. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). This exhaustion requirement applies to all claims regarding "prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002).

Exhaustion of all available administrative remedies must occur regardless of whether the administrative procedures provide the relief that the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). Furthermore, prisoners must comply with all procedural rules regarding the grievance process prior to commencing an action in federal court. *See Woodford v. Ngo*, 548 U.S. 81, 90-91, 93 (2006) (proper exhaustion "means using all steps that the agency holds out ... (so that the agency addresses the issues on the merits) ... [and] demands compliance with agency deadlines and other critical procedural rules"). An inmate's failure to exhaust administrative remedies is only excusable if the remedies are in fact unavailable. *See Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1858 (2016).

The Defendants contend that Myers did not timely file his appeal and, therefore, did not

---

(1974) (describing procedures required at disciplinary hearing only as advance notice of the charges, opportunity to call witnesses and present documentary evidence, impartial decision maker, and written decision from factfinder detailing evidence relief upon and rationale for disciplinary action taken); *Ayuso v. Semple*, No.3:18-cv-116(JAM), 2019 WL 2491628, at *5 (D. Conn. June 14, 2019) (no constitutional right to appeal from adverse disciplinary finding); *New York City Dep't of Corr.*, No.94 CV 3644, 1995 WL 604699, at *4 (E.D.N.Y. Oct. 3, 1995) (although state may afford prisoner a right to appeal from disciplinary proceeding, there is no federal constitutional right to such an appeal).

properly exhaust his administrative remedies. They assert that the appeal was untimely "because it was date stamped June 15, 2016 when it was received by the Facility ARC, which was six days past the deadline date for filing an appeal." Def. Rule 56(a)(1) Stmt at para. 36. And it is undisputed that Defendant Quiros signed a rejection notice for Myers' appeal indicating that the appeal was untimely. Doc. No. 34-20.

However, the appeal itself is dated June 9, 2016 and Myers avers by verified complaint that he submitted the appeal on June 9, 2016, the date by which it was due. That it did not reach Quiros, who was located at a different facility[5], until June 15, 2019 does not eliminate the genuine issue of material fact as to the timeliness of the appeal. The Defendants present no evidence to contradict Myers' assertion that it was placed in the box on June 9, 2016. The defendants provide no evidence, protocol, regulation or procedure which requires the ARC to *receive* the appeal within 15 days. In fact, prison directives do not specify that the appeal must be date-stamped within the filing period to be considered timely. If Myers establishes, as a matter of fact, that he did all he could do to perfect the appeal in a timely fashion, a fact finder may well determine that he exhausted his administrative remedies. The court further observes that on Quiros' rejection of the appeal, he indicates to Myers "You have exhausted DOC's Administrative Remedies." The Defendants' after the fact re-characterization of these events is rejected.

The Court concludes that the record evidence demonstrates a genuine issue of material fact as to whether the appeal was timely filed and therefore whether Myers properly exhausted his administrative remedies. The Defendants' motion for summary judgment is denied on this

---

[5] In the interim, Myers was transferred from Osborne to MacDougall-Walker.

ground.

**Due Process**

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated," the right of due process attaches. *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 569–70 (1972). "But the range of interests protected by procedural due process is not infinite." *Id.* at 570. Thus, to state a claim for violation of his right to procedural due process, Myers must show that he had a protected liberty interest and that he was deprived of that interest without being afforded due process of law.

The Defendants first assert that Myers cannot demonstrate a protected liberty interest to which the right of due process attaches. They argue that the State of Connecticut has not granted inmates a protected liberty interest in their classification and Myers cannot therefore assert a cognizable claim based on his classification as an SRG member. The Defendants cite significant authority to support this proposition, authority with which the Court takes no issue. But the authority relied upon does not resolve the issue because it does not undertake the analysis required under both Supreme Court and Second Circuit binding precedent.

Generally, the Due Process Clause, standing alone, does not create a protected liberty interest in the conditions of prison confinement if such conditions are "within the normal limits or range of custody which the conviction has authorized the State to impose." *Meachum v. Fano,* 427 U.S. 215, 225 (1976) (finding no protected liberty interest to be free from intrastate prison transfers, even to a maximum security facility, because prison officials had discretion to transfer prisoners to alternative facilities "for whatever reason or for no reason at all"). But the

12

Supreme Court has recognized that there are circumstances under which a state's statutes, policies or regulations can create a liberty interest in relation to an inmate's confinement. *See, e.g. Wolff v. McDonnell,* 418 U.S. 539 (1974) (State statute mandating sentence reduction through good time credits created a protected liberty interest in the credits such that they could not be revoked without adequate process under the Due Process Clause.).

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court reexamined the Court's jurisprudence that followed *Wolff* and *Meachum,* and the analysis that had evolved in determining whether an inmate had a state created liberty interest protected by the Due Process Clause. *Id.* at 474. The Supreme Court, in large measure, rejected the prior analysis and held that the focus of the court's analysis must be on the nature of the deprivation for which due process is sought. *Id.* at 484*.* The Court concluded that a liberty interest warranting due process protection "will generally be limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force … nonetheless imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

*Sandin* involved an inmate who had challenged the imposition of disciplinary/punitive transfer to a segregation unit. The Supreme Court determined that the conditions of "confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." Following *Sandin,* the Supreme Court made clear that the analysis had equal application in administrative non-punitive circumstances, i.e. where an inmate by dint of classification or regulation is placed in more restrictive housing. *Wilkinson v. Austin,* 545 U.S. 209 (2005). In *Wilkinson,* the Court answered the question of whether Ohio violates

prisoner due process rights in the manner by which it classifies prisoners for placement at its highest security prison, known as a "Supermax" facility. After a chilling account of the conditions at the facility, the Court concluded, under the analysis set forth in *Sandin,* that the Ohio inmates had a protected liberty interest in avoiding designation to the Supermax facility. *Id.* at 223-224. *See also Taylor v. Rodriguez,* 238 F. 3d 188, 194 (2d Cir. 2001) ("*Sandin* applies to incidents of both administrative and disciplinary segregation."); *Arce v. Walker,* 139 F.3d 329, 335 (2d Cir. 1998) (same). Thus, regardless how it is characterized,[6] the analysis required under *Sandin* controls this Court's determination as to whether Myers had a protected liberty interest with respect to his classification as an SRG Member and his placement in the SRG program, with its attendant restrictions.

The question then is whether the deprivation visited upon Myers satisfies the *Sandin* criteria. "The inquiry into the severity of confinement assesses whether differences in conditions between a restrictive housing status and the general population or other restrictive statuses constitute a significant hardship." *Taylor,* 238 F3d at 195. Myers received sanctions of fifteen days in Punitive Segregation. He alleges no facts and has presented no evidence regarding the conditions of that confinement. The other sanctions, loss of phone and commissary privileges

---

[6] Here, the Defendants' argument appears premised on their characterization of the classification as "administrative" rather than punitive. The record does not support such a premise. Myers received a disciplinary report for SRG affiliation and the May 2016 hearing was, in fact, a disciplinary hearing on that charge. Disciplinary Hearing Officer Richardson completed a Disciplinary Process Summary Report indicating that Myers had received a disciplinary report for SRG Affiliation. He received sanctions for the charge including fifteen days confinement in Punitive Segregation, thirty days loss of phone privileges, thirty days loss of commissary privileges and loss of fifteen days of Risk Reduction Earned Credit. Thus, Myers was classified as an SRG member following a disciplinary hearing in accordance with Section 7(B) of the directive. Section 7(B) provides: "An inmate shall also be designated as a Security Risk Group Member when the inmate is found guilty of the charge of Security Risk Group Affiliation in accordance with Administrative Directive 9.5, Code of Penal Discipline. In this case the disciplinary report shall act as the notification of the pending placement hearing. No hearing other than the one provided for in Administrative Directive 9.5, Code of Penal Discipline, shall be required when such designation is based on the offense of Security Risk Group Affiliation." However, as discussed above, whether the classification is labeled punitive or administrative is of no moment. The *Sandin* analysis applies.

for thirty days, are not of constitutional magnitude. *See, e.g., Montalvo v. Lamy*, 139 F. Supp. 3d 597, 606 (W.D.N.Y. 2015) (prisoners have no constitutional right to access a commissary) (citing cases); *Griffin v. Cleaver*, No. 3:03CV1029(DJS), 2005 WL 1200532, at *6 (D. Conn. May 18, 2005) (plaintiff had no constitutional right to telephone use, social visits and commissary privileges, therefore such sanctions do not support a claim for denial of due process). These sanctions, individually and in the aggregate do not constitute an "atypical and significant hardship" under *Sandin*.

But Myers also alleges that, as a result of the disciplinary finding, he was re-classified as a Security Risk Group Member and placed in the SRG Program. *See* Directive 6-14, Section 7(B) ("An inmate shall also be designated as a Security Risk Group Member when the inmate is found guilty of the charge of Security Risk Group Affiliation in accordance with Administrative Directive 9.5, Code of Penal Discipline."). Indeed, the Defendants acknowledge Myers was placed in Phase I of the SRG Program by the Security Division following the guilty findings. The question is therefore whether the restrictions and conditions placed on inmates in the SRG Program are "atypical" and present a "significant hardship" "in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484.[7]

While the Defendants acknowledge the application of *Sandin* to the question of whether Myers had a protected liberty interest in avoiding SRG classification, they utterly fail to present

---

[7] On this issue, the Defendants cite to a number of cases in which the court found no liberty interest on the part of the inmate plaintiff in his classification. The Court first notes that only one of the cases cited, *Taylor v. Levesque,* 246 Fed. Appx. 772 (2d Cir. 2007), post-dates *Austin,* where the Supreme Court made explicit that classification and placement can give rise to a protected liberty interest under *Sandin.* And in *Taylor,* the court of appeals confirmed the district court's **factual finding** that the deprivations complained of – the inability to work in prison, difficulty for his family to visit and reduction of his chances of being transferred to a prison in the United Kingdom – were not "atypical" hardships. Several cases relied upon pre-date *Sandin* and another case that post-dates *Sandin, Nievas v. Coggeshall,* 2000 WL 340749 (D. Conn. Jan. 31, 2000), does not cite *Sandin.*

fact specific analysis to support their position that the SRG Program creates no such interest. On the contrary, Myers alleges by verified complaint that the conditions of confinement in the SRG program imposes restraints that are atypical and pose a significant hardship "in relation to ordinary incidents of prison life" to include: maximum recreation of one hour a day, five days a week for up to six months; being restrained in handcuffs every time an inmate is removed from the cell; full restraints behind the back for visits and mental health appointments within the unit; full restraints in front of inmates for medical visits or sick call within the unit and outside the unit; "severe" lack of communication with family and friends; being restricted to three phone calls per week for up to six months; severely limited visitation with family and friends for at least six months; and the presence of a constant threat of physical violence and assault from "self-acknowledged gang members." Doc. No. 1, ¶ 28. Accordingly, the Defendants have failed to establish the absence of a genuine issue of material fact on the issue of whether Myers had a protected liberty interest in avoiding classification as an SRG member and placement in the SRG program. *See e.g. Taylor,* 238 F.3d at 195 (summary judgment reversed where further inquiry was required as to whether inmate's classification and placement in the SRG program created a protected liberty interest under *Sandin.*).

Assuming however that such a liberty interest exists, the court looks next to the process provided Myers in the disciplinary hearing and classification process. If the process Myers received satisfied the Due Process Clause, summary judgment may yet be appropriate.

Generally, due process requires notice and a meaningful opportunity to be heard. *See LaChance v. Erickson*, 522 U.S. 262, 266 (1998) ("The core of due process is the right to notice and a meaningful opportunity to be heard."). With respect to prison discipline, an inmate is

entitled to know the charges against him, must be given a hearing at which can contest the charges and he must be provided the reasons for the decision. *See Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). Here, Myers received notice of the SRG affiliation charge and the basis for it; was present at the hearing; was afforded the opportunity to call witnesses (which he did), and thereafter was provided with the hearing officer's decision and the reasons therefore. Due process also requires that the decision be supported by "some evidence." *Superintendent Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985). When considering this issue, the court does not re-examine the entire record, make an independent assessment of witnesses, or reweigh the evidence. The court considers only whether there is any evidence in the record to support the decision. *Id.* 455-56. Here, the hearing officer had the letter written by Myers to "Iceman" a known member of the Los Solidos street gang. The letter was replete with gang related terms from which Myers' affiliation with the Los Solidos could be inferred. In addition, though not identified, the hearing officer had confidential source information that Myers was, in fact, affiliated with Los Solidos. Although Myers was not provided the identity of the source, the hearing officer indicated that the source was deemed both credible and reliable. The Court is aware that in *Taylor v. Rodriguez*, 238 F.3d 188 (2d Cir. 2001), the Second Circuit found a violation of due process under the "some evidence" analysis in connection with a gang classification (Latin Kings). *Taylor* is factually inapposite. There, the evidence of gang affiliation relied upon by the hearing officer included only: (1) an incident from three years prior to the hearing at a different correctional facility for which no details were provided; and (2) the statements of confidential informants, which statements were not included in the hearing officer's conclusion. This paucity of evidence, combined with the failure of the

17

hearing officer to perform "some examination of …the informants' credibility" was insufficient under the Second Circuit's prior pronouncement in *Giakoumelos v. Coughlin,* 88 F.3d 56 (2d Cir. 1996), wherein the Court held that an independent credibility assessment is required to ensure a fair hearing and discipline based upon reliable evidence. *Taylor,* 238 F.3d at 194. In contrast, the hearing officer in this matter indicated on the conclusions form that the confidential informant had been assessed as credible and reliable. The letter to "Iceman" coupled with the confidential informant's information was therefore well more than adequate to provide "some evidence" as required under the Due Process Clause.

Accordingly, even if Myers had a protected liberty interest in avoiding transfer to the SRG program, the Defendants provided sufficient process to satisfy the Due Process Clause and they are entitled to judgment as a matter of law. As the false accusation claim is dependent on the due process claim, the motion for summary judgment is granted as to that claim as well. *See Mitchell v. Senkowski*, 158 F. App'x 346, 349 (2d Cir. 2005) (false accusation claim cognizable only where inmate denied due process at associated disciplinary hearing).[8]

**Motion for Default Summary Judgment**

When Myers failed to respond to the motion for summary judgment, the Defendants filed a motion for default summary judgment in which they argue that the evidence submitted in support of their motion for summary judgment shows that there are no genuine issues of material fact in dispute and they are entitled to judgment as a matter of law. The court enters summary judgment on the Defendants' initial motion and not by virtue of any default by Myers. The motion is therefore moot.

---

[8] As the Court is granting summary judgment on each of Myers' claims, the Court need not take up the qualified immunity defense.

**Conclusion**

The Defendants' motion for summary judgment [**Doc. No. 34]** is **GRANTED** in its entirety. The Defendants' motion for default summary judgment [**Doc. No. 35**] is **DENIED** as moot.

**SO ORDERED** this 21st day of October 2019 at Bridgeport, Connecticut.

                                            /s/
                                        Kari A. Dooley
                                        United States District Judge